IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUAN VAZQUEZ, | : CIVIL NO. 1:CV-13-01067 |
| Plaintiff | : (Judge Rambo) |
| v. | : |
| CO YEOMAN, et al., | : |
| Defendants | : |

# **M E M O R A N D U M**

Plaintiff Juan Vazquez, an inmate currently incarcerated at the State Correctional Institution in Albion, Pennsylvania ("SCI-Albion"), commenced this civil rights action with a complaint filed on April 24, 2013, pursuant to the provisions of 42 U.S.C. § 1983. (Doc. 1.) In his complaint, Plaintiff asserts both federal and state claims regarding back injuries and pain resulting from his cell assignment while he was previously incarcerated at the State Correctional Institution at Smithfield ("SCI-Smithfield") in Huntingdon, Pennsylvania. Currently named as Defendants are Correctional Officer ("CO") Yeoman and Sergeant Borosky ("Corrections Defendants"), both employed at SCI-Smithfield.[1] As relief, Plaintiff seeks compensatory and declaratory relief.

---

[1] Plaintiff also named Josh Mahute, a Certified Nurse Practitioner ("CNP"), in his complaint. However, by memorandum and order dated April 23, 2014, the court granted CNP Mahute's motion to dismiss the complaint and terminated him as a party in this action. (Docs. 40 & 41.)

Presently before the court is a motion for summary judgment filed by Corrections Defendants. (Doc. 63.) For the reasons set forth below, the motion for summary judgment will be granted.

## I.   Background

### A.   Facts

The following facts are related to Plaintiff's claims. The court notes any factual disputes between the parties by presenting both parties' contentions.

Plaintiff was transferred as an inmate from SCI-Camp Hill to SCI-Smithfield on August 31, 2011. (Doc. 65 ¶ 1.) In his complaint, Plaintiff avers that, at that time, he was having chronic back problems and trouble keeping his balance. (Doc. 1 ¶ 8.) However, Plaintiff did not have a medical restriction requiring him to be housed on the ground level of a housing unit. (Doc. 65 ¶ 2.)

According to Plaintiff's medical records, on September 8, 2011, Plaintiff was seen at sick call by CNP Mahute for "many requests." (*Id*. ¶ 3; Doc. 66-1 at 2, Ex. A, Plaintiff's Relevant Medical Records.) The records reveal that CNP Mahute ordered a cane for Plaintiff on that day, but did not order a medical restriction directing Plaintiff to be housed on a ground level tier. (Doc. 65 ¶ 4; Doc. 66-1 at 2.) Plaintiff admits that the records reflect CNP Mahute did not order the medical restriction, but he adds

2

that he requested bottom tier status from CNP Mahute at that sick call visit. (Doc. 75 ¶ 4.) Nevertheless, in a declaration filed on the record, CNP Mahute confirms that he did not order a ground level restriction for Plaintiff that day, and that a cane, in and of itself, does not warrant a ground level restriction because there are inmates who can safely ambulate steps with a cane. (Doc. 65 ¶ 5; Doc. 66-5 ¶ 5, Ex. E, Decl. J. Mahute.) Plaintiff disputes this fact, countering that he himself could not safely ambulate steps with a cane. (Doc. 75 ¶ 5.)

On September 15, 2011, Plaintiff returned to sick call, where he was assessed by CNP Mahute at 10:10 a.m. for a reported slip on the steps in his housing unit. (Doc. 65 ¶ 6.) Plaintiff reported that the slip occurred "two or three days" prior to September 15, 2011, but he caught himself when he slipped and was not injured. (*Id*. ¶¶ 6, 7.) Resultantly, at that sick call appointment, CNP Mahute entered a medical order for Plaintiff to be placed on bottom tier housing. (*Id*. ¶ 8.) Specifically, this order was entered on September 15, 2011, at 10:10 a.m. (*Id*. ¶¶ 9, 15.) Moreover, even though he entered this order, CNP Mahute did not view Plaintiff as an "imminent fall risk." (*Id*. ¶ 10.) Had he viewed Plaintiff as such, he would have housed him in the infirmary and not permitted him to walk back to the housing block. (*Id*.) Plaintiff disputes CNP Mahute's declaration with respect to an "imminent fall risk," claiming that this risk is not a prerequisite to bottom tier housing status for the "mobility

3

impaired." (Doc. 75 ¶ 10.) In support, he claims that inmates who are in wheelchairs have the status of "imminent fall risk" but are assigned to bottom tier housing in general population rather than the infirmary. (*Id.*) Plaintiff also counters that he is not able to determine CNP Mahute's state of mind with regard to his views on Plaintiff's status as an "imminent fall risk."[2] (*Id.*)

CNP Mahute did not personally communicate to the block corrections officers the fact that he added a ground level restriction to Plaintiff's housing assignment on September 15, 2011. (Doc. 65 ¶ 11.) Rather, once CNP Mahute enters a restriction into the medical records, after necessary approvals, the information is ultimately conveyed to the corrections officers in charge of housing. (*Id.* ¶ 12.) Further, when an order related to a medical restriction is entered into an inmate's medical records, the restriction is also placed in the DOC's DOCnet computer system under "medical housing status." (*Id.* ¶ 13.) Plaintiff disputes both these facts by simply stating that he is not privy to the communications and procedures of medical and correctional staff.[3] (Doc. 75 ¶¶ 11, 12.)

---

[2] The court notes that a case management order was issued in this case on May 28, 2014, setting forth, *inter alia*, a deadline for the completion of discovery. (Doc. 43.) From the record, including Plaintiff's exhibits filed in support of his opposition to the instant motion, (Doc. 76), it is clear that Plaintiff has taken the opportunity to conduct discovery in this matter. (*See* Docket, generally.)

[3] *See supra* note 2, at 4.

As to the ground level housing restriction ordered by CNP Mahute, the DOC's computerized records confirm that Plaintiff was first given the housing restriction on September 15, 2011. (Doc. 65 ¶ 14.) A Nurse Miner entered the restriction into the computer, and there is no earlier entry indicating this assignment. (*Id*.; Doc. 66-7, Ex. G, Plaintiff's Inmate Housing Status Summary.) Plaintiff disputes the fact that he was initially given the ground level restriction on September 15, 2011; rather, he counters that the ground level assignment was first entered on August 31, 2011, and confirmed by CNP Mahute on September 1, 2011.[4] (Doc. 75 ¶ 14; Doc. 76, Ex. 3.) However, as stated above, the computerized records indicate no such earlier entry. (*See* Doc. 66-7.) Nevertheless, Plaintiff does admit that a ground level restriction was ordered by CNP Mahute on September 15, 2011, at 10:10 a.m. (*See* Doc. 75 ¶ 15.)

Housing restrictions requiring the move of an inmate may require a series of approvals and may take up to 48 hours to be implemented. (Doc. 65 ¶ 16.) Plaintiff

---

[4] In connection with this fact disputed by Plaintiff, Defendants previously filed a motion for sanctions, declaring that Plaintiff's medical record from August 31/September 1, 2011 has been fraudulently altered to include a ground level assignment. (*See* Doc. 47; Doc. 50, Ex. 3.) In support, Defendants claim that Plaintiff had the opportunity to alter the medical record when he inspected and examined his records on file at his institution. (*See* Doc. 53.) In addition, in a declaration in support of the motion, CNP Mahute declared: (1) he evaluated Plaintiff on August 31, 2011 as a new intake at SCI-Smithfield; (2) he specifically recalls not issuing Plaintiff a ground level restriction on that day; (3) the medical record indicating that he ordered a ground level restriction at that time is a forgery; and (4) the "X" next to the ground level restriction on the medical form is not in his handwriting. (Doc. 50-6, Ex. 6, Mahute Decl.) Plaintiff opposed the motion. (Doc. 52.) By order dated September 30, 2014, the court denied the motion for sanctions, as Defendants had already filed a motion for summary judgment and any disputes of material fact would be resolved by the court in its disposition of that motion. (Doc. 70.)

disputes this fact by simply stating that he is not privy to these procedures.[5]  (Doc. 75 ¶ 16.)  If the bottom tier of a housing unit is filled, an inmate would need to be moved to accommodate another inmate's ground level restriction move.  (Doc. 65 ¶ 17.)  Every move of an inmate must be approved by the office that addresses population management.  (*Id*.)  Plaintiff disputes this fact and, in support, cites Defendants' responses to his interrogatories.  (Doc. 75 ¶ 17.)  As to Defendant Borosky, Plaintiff claims that, in his response to Plaintiff's interrogatory number 12, Defendant Borosky stated that "he possessed independent-authority to facilitate prisoner cell-moves at any time for safety reasons."  (*Id*.) (citing Doc. 76 at 11, Ex. 4).  However, this interrogatory and response thereto actually read as follows: "Within the construct of your employment as a block-officer, do you possess the authority to move a prisoner from one cell to another for safety reasons, and if not, what steps would you need to take in order to effectuate such a cell move within the housing-unit?  Response: Yes."  (Doc. 76 at 11, Ex. 4.)  There is no mention here of "independent authority."  (*Id*.)  Turning to Defendant Yeoman, Plaintiff claims that, in his response to Plaintiff's same interrogatory number 12, Defendant Yeoman "averred that he need only contact an L-4 block sergeant or an L-3 senior c-o-1 officer to facilitate such prisoner cell moves."  (Doc. 75 ¶ 17.)  To the contrary, in Defendant Yeoman's actual response to the same

---

[5]  *See supra* note 2, at 4.

6

interrogatory 12, he stated, "I cannot move an inmate without the approval of the block Sergeant on a Level 4 block or the Senior CO1 on a Level 3 block. If neither are around, I would need the unit manager's approval to move the inmate." (Doc. 76 at 22, Ex. 5.)

In addition, before a cell move can take place, a suitable cell mate would need to be located. (Doc. 65 ¶ 18.) Each inmate's belongings would need to be searched. (*Id.*) And sufficient staff must be present to carry out the searches and effectuate the cell move. (*Id.*) Plaintiff disputes these facts, claiming that they relate to restricted housing unit cell moves rather than general population moves, and cites a DOC procedures manual that is not in the record. (Doc. 75 ¶ 18.)

Turning back to September 15, 2011, Plaintiff's medical records reflect that, after he visited CNP Mahute at sick call that morning, at approximately 4:35 p.m., nurses were called to Plaintiff's housing block where he had fallen again, this time down four (4) to five (5) steps. (Doc. 65 ¶ 19.) One nurse noted that the area where Plaintiff fell was wet. (*Id.*) Plaintiff was taken to an outside hospital the same day. (Doc. 1 ¶ 15.) In his complaint, Plaintiff claims that he injured his back again and now "sometimes suffers partial paralysis in shoulder and arm area with constant headaches." (*Id.* ¶ 16.)

7

Finally, as to Defendants' knowledge related to this case, it is undisputed that Defendant Yeoman did not work on September 15, 2011, and therefore was not made aware of Plaintiff's ground level restriction ordered by CNP Mahute that day. (Doc. 65 ¶ 20.) Defendant Borosky did work on September 15, 2011, on the 6:00 a.m. to 2:00 p.m. shift, but was not working when Plaintiff fell on the stairs at approximately 4:35 p.m. (*Id.* ¶ 21.) Further, prior to Plaintiff's fall that day, Defendant Borosky was not made aware that Plaintiff had received a medical restriction on the morning of September 15, 2011, that required him to be housed on the ground level of the housing unit. (*Id.* ¶ 22.) Plaintiff disputes these facts, countering that Defendant Borosky should have known when the medical restriction was ordered because it was done so during Borosky's shift that day. (Doc. 75 ¶ 21.) He also generally asserts that he repeatedly informed Defendants Yeoman and Borosky of his need to be housed on the bottom tier; however, this fact does not include an accompanying institution order for such an assignment made earlier than the one ordered on September 15, 2011. (*Id.* ¶ 22.)

### B. **Procedural History**

Plaintiff filed his complaint on April 24, 2013, naming Corrections Defendants as well as CNP Mahute.  (Doc. 1.)  A motion for leave to proceed *in forma pauperis* followed on May 17, 2013.  (Doc. 6.)  By order dated May 28, 2013, the court granted the motion for leave to proceed *in forma pauperis* and directed service of the complaint.  (Doc. 10.)  CNP Mahute and Corrections Defendants filed motions to dismiss the complaint on August 5 and August 12, 2013, respectively.  (Docs. 23 & 25.)

After Plaintiff was granted an extension of time to file his opposition to the motions, (*see* Doc. 30), he filed such opposition, (Docs. 33 & 35), and a proposed amended complaint, (Doc. 34).  By memorandum and order dated April 23, 2014, the court granted CNP Mahute's motion to dismiss and dismissed him as a party, and granted in part and denied in part Corrections Defendants' motion to dismiss.  (Docs. 40 & 41.)  The court also directed that Plaintiff's proposed amended complaint be stricken, as it was not accompanied by a requisite motion for leave to file an amended complaint, and it did nothing to cure the deficiencies noted in the court's disposition of the motions to dismiss with respect to the claims in the original complaint.  (*See id*.)

On May 28, 2014, the court issued a case management order setting forth various deadlines.  (Doc. 43.)  After the period set for discovery had expired, Corrections Defendants filed the instant motion for summary judgment.  (Doc. 63.)

Plaintiff has filed his opposition (Doc. 74) and, thus, the motion for summary judgment is ripe for disposition.

## II. Standard of Review

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for granting a motion for summary judgment. Rule 56(a) provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id*. When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005), *cert. denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party

points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

**III.   Discussion**

As a result of the court's disposition of Corrections Defendants' previously-filed motion to dismiss, the only remaining claim against Corrections Defendants Yeoman and Borosky is an Eighth Amendment deliberate indifference claim for their failure to move Plaintiff to a bottom tier cell prior to his fall on September 15, 2011. In the instant motion for summary judgment, Corrections Defendants argue that Plaintiff has failed to establish that they were deliberately indifferent to his serious medical needs with respect to this bottom tier designation. For the reasons that follow, the court finds that Plaintiff's deliberate indifference claim fails and will, thus, grant the motion for summary judgment in favor of Corrections Defendants.

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Rhodes v. Chapman*, 542 U.S. 337, 349 (1981)). The Eighth Amendment prohibition against cruel and unusual punishment requires that prison officials provide "humane conditions of confinement" including "adequate food, clothing, shelter and medical care." *Farmer*, 511 U.S. at 832.

"[T]o establish an Eighth Amendment violation an inmate must allege both an objective element - that the deprivation was sufficiently serious - and a subjective element - that a prison official acted with a sufficiently culpable state of mind, *i.e.*, deliberate indifference." *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir. 1996) (citing *Wilson*

*v. Seiter*, 501 U.S. 294 (1991)). "The objective inquiry is whether the inmate was 'denied the minimal civilized measure of life's necessities.'" *Fuentes v. Wagner*, 206 F.3d 335, 345 (3d Cir. 2000) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). To satisfy the subjective component, an inmate must prove that a prison official demonstrated "deliberate indifference" to a serious risk of harm to which the inmate was exposed. *Farmer*, 511 U.S. at 836-37. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

In the instant case, in their supporting brief Corrections Defendants seemingly concede the objective element of Plaintiff's Eighth Amendment claim, or that Plaintiff was subjected to a deprivation deemed sufficiently serious. (*See* Doc. 64.) Instead, they contend that the undisputed facts establish that Plaintiff has not met his burden of showing that either Corrections Defendant was subjectively aware of a serious risk of harm to Plaintiff and failed to take steps to abate it. (*Id*.) Upon careful review, the court agrees that Plaintiff has failed to establish this subjective element.

First, although Plaintiff began using a cane on September 8, 2011, there was no corresponding order for him to be housed on the bottom tier of his housing unit. In fact, CNP Mahute confirmed that he did not order a ground level restriction that day. In addition, CNP Mahute asserted that a cane, in and of itself, does not warrant a ground level restriction because there are inmates who can safely ambulate steps with a cane. As such, despite Plaintiff's subjective belief that he could not safely ambulate steps with a cane and should have been moved to the ground level, Defendants Yeoman and Borosky simply had no directive at that time regarding a cell move for Plaintiff.

Furthermore, Plaintiff ultimately did receive an order for bottom tier designation, but not until September 15, 2011, at 10:10 a.m. At the time Plaintiff fell down the steps that day at approximately 4:35 p.m., it is undisputed that Defendant Yeoman was not working at all that day. As a result, Defendant Yeoman could not have been aware of the order in question, let alone been at the institution to facilitate a cell move for Plaintiff. As for Defendant Borosky, his shift ended at 2:00 p.m., and he has declared that he was not made aware of the ground level restriction order at that time. Given the facts provided by Defendants as to the logistics involved in moving an inmate from one cell to another, it is reasonable to assume that Defendant Borosky could not have accomplished such a move for Plaintiff between 10:10 a.m. (the time

the order was entered) and 2:00 p.m. (the time Borosky's shift ended). This is especially true given that CNP Mahute has declared that he did not personally inform the officers of the ground level restriction order at the time he placed the order.

Moreover, even, *assuming arguendo*, that Plaintiff is correct in asserting that CNP Mahute placed an order in Plaintiff's medical record for a ground level restriction on August 31/September 1, 2011, the DOC computerized records clearly show that an order directing a ground level restriction was not entered until 10:10 a.m. on September 15, 2011. (*See* Doc. 76, Ex. 3.) Indeed, Plaintiff does not dispute this fact. (Doc. 75 ¶ 15.) As a result, the earliest Defendants Yeoman and Borosky could have been made aware of such an order was September 15, 2011. As already established, Defendant Yeoman was not working on that day, and Defendant Borosky's shift ended at 2:00 p.m. Given the procedures that must be followed by staff following an order for an inmate cell move, the court concludes that Defendant Borosky cannot be deliberately indifferent for failing to accomplish Plaintiff's cell move within the time period the order was entered (10:10 a.m.) and the end of Defendant Borosky's shift (2:00 p.m.).

In sum, the court concludes that Plaintiff has failed to meet his burden of demonstrating that either Defendant Yeoman or Borosky knew of and disregarded an excessive risk to Plaintiff's health and safety in connection with the events

surrounding Plaintiff's fall on his housing unit's steps on September 15, 2011.  Thus, Corrections Defendants' motion for summary judgment will be granted in their favor.

## IV. <u>Conclusion</u>

For the reasons set forth above, Corrections Defendants' motion for summary judgment (Doc. 63) will be granted.  Judgment shall be entered in favor of Corrections Defendants and against Plaintiff, and this case will be closed.

An appropriate order will issue.

                                                                      s/Sylvia H. Rambo  
                                                                  United States District Judge

Dated:  April 28, 2015.